Slip Op. 20 - 139

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DONG-A STEEL COMPANY,<br><br>                              Plaintiff,<br><br>      and<br><br>KUKJE STEEL CO., LTD.,<br><br>                                   Consolidated Plaintiff,<br><br>      v.<br><br>UNITED STATES,<br><br>                              Defendant,<br><br>      and<br><br>INDEPENDENCE TUBE CORPORATION,<br>SOUTHLAND TUBE, INCORPORATED,<br>ATLAS TUBE, and SEARING INDUSTRIES,<br><br>                              Defendant-Intervenors. | Before: Gary S. Katzmann, Judge<br>Consol. Court No. 19-00104<br><br>*PUBLIC VERSION* |

## OPINION

[Plaintiffs' motion for judgment on the agency record is granted in part, and Commerce's Final Determination is remanded consistent with this opinion.]

Dated:  September 29, 2020

Jarrod M. Goldfeder, Trade Pacific, LLP, of Washington, DC, argued for plaintiff and consolidated plaintiff.  With him on the brief was Robert G. Gosselink.

Robert R. Kiepura, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director and Tara K. Hogan, Assistant Director.  Of counsel was Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.  With them on the supplemental brief was Ethan P. Davis, Acting Assistant Attorney General

**PUBLIC VERSION**

<u>Robert E. DeFrancesco, III</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenors, Independence Tube Corporation and Southland Tube, *Incorporated*. With him on the brief were <u>Alan H. Price</u>, and <u>Jake R. Frischknecht; and supplemental brief Elizabeth V. Baltzan</u>.

<u>Roger B. Schagrin</u>, Wiley Rein LLP, of Washington, DC, for defendant-intervenors, *Atlas Tube* and *Searing Industries*.

     Katzmann, Judge:  Did the Trade Preferences Extension Act of 2015 ("TPEA") provide the United States Department of Commerce ("Commerce") statutory authority to make a contested adjustment to the cost of production in an antidumping ("AD") proceeding?  Were the application of various adjustments and the denial of others unsupported by substantial evidence?  These are among the issues presented by this case, involving a challenge to Commerce's determination that Korean producers of heavy walled rectangular welded carbon steel pipes and tubes[1] ("HWR") sold

---

[1] Heavy walled rectangular welded carbon steel pipes and tubes ("HWR") are pipes and tubes that are suitable, among other purposes, for the construction of offshore structures, owing to the carbon steel's high strength and its ability to take various structural shapes.  CARBON STEEL PIPE AND CARBON STEEL TUBE, https://www.alro.com/divsteel/metals_comp_type.aspx?Mat=CARBON%20STEEL&Type=Pipe%20/%20Tube&mc=CS (last visited Sept. 25, 2020); Jung Suk-Yee, <u>United States Imposes High Tariff on South Korean Pipes and Tubes</u>, BUSINESSKOREA (Nov. 22, 2019, 8:57 AM), http://www.businesskorea.co.kr/news/articleView.html?idxno=38348(last visited Sept. 25, 2020).  As to the product's specifications, Commerce provides:

> The merchandise subject to the order is certain heavy walled rectangular welded steel pipes and tubes of rectangular (including square) cross section, having a nominal wall thickness of not less than 4 mm.  The merchandise includes, but is not limited to, the American Society for Testing and Materials (ASTM) A–500, grade B specifications, or comparable domestic or foreign specifications.  Included products are those in which: (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements below exceeds the quantity, by weight, respectively indicated:
>
> 2.50 percent of manganese, or
> 3.30 percent of silicon, or
> 1.50 percent of copper, or
> 1.50 percent of aluminum, or
> 1.25 percent of chromium, or
> 0.30 percent of cobalt, or

their product in the United States at below normal value in their home market, resulting in the

imposition of AD duties.  Under this determination, Commerce imposed AD duty rates of 20.79

and 12.81 percent on Korean HWR manufacturers Dong-A Steel Company ("DOSCO") and Kukje

Steel Company ("Kukje") (collectively, "Plaintiffs"), respectively.  Heavy Walled Rectangular

Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping

Duty Administrative Review and Final Determination of No Shipments 2016–2017, 84 Fed. Reg.

24,471 (Dep't Commerce May 28, 2019), P.R. 244 ("Final Results") and accompanying Mem.

from G. Taverman to J. Kessler, re: Issues and Decision Mem. for the Final Results of the

2016−2017 Administrative Review of the Antidumping Duty Order on Heavy Walled Rectangular

Welded Carbon Steel Pipes and Tubes from the Republic of Korea (Dep't Commerce May 20,

2019), P.R. 237 ("IDM").

Plaintiffs bring this action against the United States (the "Government") to challenge

Commerce's dumping margin determinations and move for judgment on the agency record

---

0.40 percent of lead, or
2.0 percent of nickel, or
0.30 percent of tungsten, or
0.80 percent of molybdenum, or
0.10 percent of niobium (also called columbium), or
0.30 percent of vanadium, or
0.30 percent of zirconium.

The product is currently classified under following Harmonized Tariff Schedule of the United States (HTSUS) item numbers 7306.61.1000. Subject merchandise may also be classified under 7306.61.3000.  Although the HTSUS numbers and ASTM specification are provided for convenience and customs purposes, the written description remains dispositive.

Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018), P.R. 211 and accompanying Mem. from J. Maeder to G. Taverman, re: Decision Mem. for the Prelim. Results at 3–4 (Dep't Commerce Oct. 3, 2018), P.R. 203.

***PUBLIC VERSION***

pursuant to Rule 56.2 of the U.S. Court of International Trade.  DOSCO's Mem. in Supp. of the

R. 56.2 Mot. of Pl., DOSCO, for J. on Agency R., ECF No. 37 ("Pl.'s Br."); Mem. in Support of

the R. 56.2 Mot. of Consol. Pl., Kukje, for J. Upon the Agency Rec., ECF No. 38 ("Consol. Pl.'s

Br.").  Specifically, Plaintiffs argue that Commerce erred by (1) finding the existence of a

particular market situation[2] ("PMS") in Korea for hot rolled steel coil ("HRC"), an input used to

produce HWR; and (2) applying a cost-based PMS adjustment to Plaintiffs' margin calculations -

- under the auspices of TPEA -- outside the scope of a constructed value-to-price comparison.  Pl.'s

Br. at 1–2.  <u>See</u> Consol. Pl.'s Br. at 3.  Plaintiffs additionally argues that Commerce improperly:

(1) used DOSCO's theoretical rather than actual product weights; (2) determined that DOSCO was

not entitled to a constructed export price ("CEP") offset; and (3) adjusted DOSCO's reported raw

costs to capture physical differences across product units.  Pl.'s Br. at 2–4.  <u>See</u> Consol. Pl.'s Br.

at 3.  The court grants, in part, Plaintiffs' motion for judgment on the agency record and remands

to Commerce its PMS determination and adjustment.  The court sustains Commerce's

determinations on the remaining issues.

## BACKGROUND

### I.      *Legal and Regulatory Framework*

Dumping occurs when a foreign company sells goods into the United States at a lower

price than the company charges for the same product in its home market.  <u>Sioux Honey Ass'n v.</u>

<u>Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1047 (Fed. Cir. 2012).  To address the economic distortions

---

[2] A particular market situation is any circumstance that "prevents a proper comparison" between a product's normal value and its export price.  <u>See</u> 19 U.S.C. 1677b(a)(1)(B)(ii)(III).  Under such circumstances, Commerce is authorized to use different methodologies to estimate normal value other than looking only at the exporting country's sales price, as is the normal method.  For instance, Commerce may turn to the product's third country sales or constructed value instead. <u>See</u> Background <u>infra</u> Sec. I. B.

arising from such conduct, Congress enacted the Tariff Act of 1930,[3] which empowers Commerce
to investigate potential dumping activity and, if necessary, to issue orders imposing duties on
subject merchandise.  Id.  When Commerce concludes that AD duties are appropriate, the agency
is required to determine margins as accurately as possible.  Rhone Poulenc, Inc. v. United States,
899 F.2d 1185, 1191 (Fed. Cir. 1990).

Pursuant to 19 U.S.C. § 1673, Commerce imposes AD duties on foreign goods if it
determines that the goods are being, or are likely to be, sold at less than fair value, and if the United
States International Trade Commission concludes that the sale of the merchandise below fair value
"materially injures, threatens, or impedes the establishment of an industry in the United States."
Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017).
Merchandise is sold at less than fair value when the product's normal value is greater than the
price charged for the product in the United States (represented by the product's export price or the
product's CEP).  Union Steel v. United States, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  The AD
duty is calculated by determining the difference between the normal value and the export or CEP
for the merchandise.  19 U.S.C. § 1673.

### A.    Standard Normal Value Calculation Methodology

Normal value is ordinarily computed by looking at the sales price of the subject
merchandise in the exporting country.  19 U.S.C. § 1677b(a)(1)(B)(i).  However, Congress

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19
of the U.S. Code, 2012 edition. Citations to 19 U.S.C. §§ 1677(15), 1677b, and 1677m, however,
are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition.  The
current U.S.C.A. reflects the amendments made to 19 U.S.C. §§ 1677(15), 1677b, 1677m (2012)
by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–
84 (2015).  The TPEA amendments are applicable to all determinations made on or after August
6, 2015, and therefore, are applicable to this proceeding.  See Dates of Application of Amendments
to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act
of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

**PUBLIC VERSION**

authorized Commerce to disregard the exporting country's sales price and to instead base the

calculation of normal value on third country sales if Commerce determines that a PMS exists in

the exporter's home market.  19 U.S.C. § 1677b(a)(1)(C)(iii).[4]  Alternatively, should Commerce

find that normal value cannot be reliably determined from the exporting country's sales price,

Commerce may also use the product's constructed value[5] ("CV"), calculated pursuant to 19 U.S.C.

§ 1677b(e), in lieu of normal value.  19 U.S.C. § 1677b(a)(4).  This approach, however, is similarly

subject to a prior determination that the constructed value calculation would not be adversely

distorted by the existence of an underlying PMS.  Id.

---

[4] In AD duty investigations, Commerce is directed to make a fair comparison between normal
value and export price, pursuant to 19 U.S.C. § 1677b(a)(1)(B)(i), which provides:

> In determining under this title whether subject merchandise is being, or is likely to
> be, sold at less than fair value, a fair comparison shall be made between the export
> price or [CEP] and normal value.  In order to achieve a fair comparison with the
> export price or [CEP], normal value shall be determined [as] . . . the price at which
> the foreign like product is first sold (or, in the absence of a sale, offered for sale)
> for consumption in the exporting country.

However, 19 U.S.C. § 1677b(a)(1)(C)(iii), spells out an exception when "[t]he particular market
situation in the exporting country does not permit a proper comparison with the export price or
[CEP]."  In such cases Commerce is directed to use "third country sales" as the basis for estimating
the product's normal value.  19 U.S.C. § 1677b(a)(1)(B)(ii).

[5] As specified in 19 U.S.C. § 1677b(e), constructed value represents: (1) "the cost of materials and
fabrication or other processing of any kind [used] in producing the merchandise;" (2) "the actual
amounts incurred and realized" for "selling, general, and administrative expenses, and for profits,
in connection with the production and sale of a foreign like product, in the ordinary course of trade,
for consumption in the foreign country[;]" and (3) the cost of packing the subject merchandise.

Further, 19 U.S.C. § 1677b(e) provides that:

> [I]f a particular market situation exists such that the cost of materials and fabrication or
> other processing of any kind does not accurately reflect the cost of production in
> the ordinary course of trade, the administering authority may use another calculation
> methodology under this part or any other calculation methodology.

The meaning of "ordinary course of trade" is in turn drawn from 19 U.S.C. § 1677(15).

### B.   *Particular Market Situation Determinations and Adjustments under the TPEA.*

Broadly, a PMS exists when a market possesses a unique set of circumstances that "prevents a proper comparison" between a product's normal value and its export price or CEP. See 19 U.S.C. § 1677b(a)(1)(B)(ii)(III).  However, previous versions of the Tariff Act fell short of providing an explicit definition for a PMS.  See Tariff Act, Pub. L. 103-465, § 773 (1994) (amended 2015).  In 2015, Congress passed the TPEA, which, among other objectives, amended existing AD and countervailing duty statutes.  Trade Preferences Extension Act of 2015 § 504, 19 U.S.C. §§ 1677(15), 1677b(e).  Section 504 of the TPEA in particular provided greater color to the meaning and scope of particular market situations and clarified the circumstances under which Commerce may apply adjustments on the basis of a PMS determination.  Specifically, section 504(a) incorporated PMS determinations as a circumstance existing outside of a country's ordinary course of trade.[6]  See 19 U.S.C. § 1677(15)(C).  Concurrently, section 504(c) of the TPEA amended the calculation of constructed value to allow for PMS-specific adjustments.  See 19

---

[6] Section 1677(15) provides:

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind.  The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

(A) Sales disregarded under section 773(b)(1) [regarding sales at less than cost of production].

(B) Transactions disregarded under section 773(f)(2) [regarding special rules].

(C) Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

U.S.C. § 1677b(e).  Here, the TPEA stipulates that a PMS exists when "the costs of materials and

fabrication or other processing of any kind does not accurately reflect the cost of production in the

ordinary course of trade," impeding Commerce's ability to accurately estimate a product's CV.

See 19 U.S.C. § 1677b(e)(3).  Under such a determination, the TPEA authorizes Commerce to use

"any other calculation methodology" to determine the cost of production in the exporting country

for the purposes of calculating CV.  Id.

### C.        *CEP Offset Determination*

Beyond correcting for the distortive effects of a PMS, part of Commerce's statutory

mandate to conduct a "fair comparison" of normal value and export price also involves making:

> [T]wo types of adjustments to normal value based on differences in the level of
> trade.  The first type is a level of trade adjustment, 19 U.S.C. § 1677b(a)(7)(A), and
> the second type is a [CEP] offset, 19 U.S.C. § 1677b(a)(7)(B).  Commerce will
> grant a [CEP] offset when "normal value is established at a level of trade which
> constitutes a more advanced stage of distribution than the level of trade of the
> [CEP], but the data available do not provide an appropriate basis to determine . . .
> a level of trade adjustment."  Id.  When these two conditions are present, Commerce
> must lower the normal value "by the amount of indirect selling expenses incurred
> in the country in which normal value is determined on sales of the foreign like
> product but not more than the amount of such expenses for which a deduction is
> made."  Id.

Dong-A Steel Co. v. United States, 42 CIT __, __, 337 F. Supp. 3d 1356, 1374 (2018).  In sum,

Commerce may grant a CEP offset when it determines that an exporter's home market is at a "more

advanced stage" than its foreign markets, based in large part on the quantity and intensity of sales

activities occurring at each market.  19 C.F.R. §§ 351.412(c)(2), 351.412(f)(1)(ii) (2020).  Upon

such a determination, Commerce is instructed to reduce its calculation of normal value to account

for the difference in expenses that went towards the product's sales.  Simply put, when the home

market level of trade ("LOT") is more advanced than the CEP LOT, but Commerce lacks the data

to determine whether the difference will adversely impact price comparability, Commerce is

instructed to grant a CEP offset. <u>See</u> 19 U.S.C. § 1677b(7)(B); 19 C.F.R. § 351.412(f). "The party seeking a CEP offset bears the burden of establishing that the differences in selling functions performed in the home and US markets are 'substantial.'" <u>Hyundai Steel Co. v. United States</u>, 43 CIT __, __, 365 F. Supp. 3d 1294, 1300 (2019) (citations omitted) ("Hyundai I"); <u>see also</u> 19 C.F.R. § 351.401(b)(1) (providing that the burden of establishing entitlement to a particular adjustment rests with the party in possession of the relevant information); <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 33 CIT 533, 556, 616 F. Supp. 2d 1354, 1374, (2009) ("While it is Commerce's responsibility to determine if a petitioner qualifies for a CEP offset, it is the responsibility of the respondent requesting the CEP offset to procure and present the relevant evidence to Commerce.").

## II.    Factual and Procedural History of the Case

### A.    Commerce's Administrative Review of HWR

On August 17, 2015, Commerce initiated an investigation into HWR. <u>See</u> <u>Initiation of Less-Than-Fair-Value Investigations</u>, 80 Fed. Reg. 49,202, 49,203 (Dep't Commerce Aug. 17, 2015). The investigation culminated in 2016 with an AD order on HWR pipe and tube from Korea. <u>See</u> <u>Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, Mexico, and the Republic of Turkey: Antidumping Duty Orders</u>, 81 Fed. Reg. 62,865, 62,866 (Dep't Commerce Sept. 13, 2016) ("the <u>Order</u>").

This action arises from Commerce's September 2017 publication of a notice of opportunity to request review of the <u>Order</u> for the period covering March 1, 2016, to August 31, 2017. <u>Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review</u>, 82 Fed. Reg. 41,595, 41,596 (Dep't Commerce Sept. 1, 2017), P.R. 3. Following requests from domestic producers of HWR (including Independence Tube Corp.

and Southland Tube, Inc., Nucor companies; Atlas Tube, a division of Zekelman Industries; and

Searing Industries) (collectively, "Petitioners"), as well as from DOSCO and HiSteel, another

Korean HWR manufacturer and exporter, Commerce commenced its 2016–2017 administrative

review of the <u>Order</u> on November 13, 2017.  <u>See</u> <u>Initiation of Antidumping and Countervailing</u>

<u>Duty Administrative Reviews</u>, 82 Fed. Reg. 52,268 (Dep't Commerce Nov. 13, 2017), P.R. 5;

Mem. from J. Maeder to G. Taverman, re: Decision Mem. for the Prelim. Results at 2 n.3 (Dep't

Commerce Oct. 3, 2018), P.R. 203 ("PDM").  For this review, Commerce selected DOSCO and

HiSteel as mandatory respondents.[7]  <u>See</u> Mem. from A. Wood to M. Skinner, re: Selection of

Resp't for Individual Review (Jan. 12, 2018), P.R. 16.

As part of their submissions, Petitioners argued that there existed a PMS in Korea that

distorted the COP of Korean HWR.  Letter from Wiley Rein LLP to Sec'y Commerce, re: Heavy

Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Particular

Market Situation Allegation and Supporting Information (Aug. 31, 2018), P.R. 160 ("Petitioners'

PMS Allegation").  Petitioners cited four factors in support of their PMS allegation: (1)

---

[7] In AD duty investigations or administrative reviews, Commerce may select mandatory
respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin
> determinations [in investigations or administrative reviews] because of the large
> number of exporters or producers involved in the investigation or review, the
> administering authority may determine the weighted average dumping margins for
> a reasonable number of exporters or producers by limiting its examination to-
>
>> (A) a sample of exporters, producers, or types of products that is statistically
>> valid based on the information available to the administering authority at
>> the time of selection, or
>>
>> (B) exporters and producers accounting for the largest volume of the subject
>> merchandise from the exporting country that can be reasonably examined.

Case 1:19-cv-00104-GSK   Document 68   Filed 10/01/20   Page 11 of 50

Consol. Court No. 19-00104                                                    Page 11
*PUBLIC VERSION*

government subsidization of Korean hot-rolled steel products; (2) the distortive pricing of unfairly

traded HRC from China; (3) strategic alliances between Korean HRC suppliers and Korean HWR

pipes and tubes producers; and (4) distortive government control over electricity prices in Korea.

Id. at 23−24.  Petitioners claimed that earlier administrative reviews determined the existence of a

PMS in Korea for products similar to HWR -- including oil country tubular goods ("OCTG"),

welded line pipe ("WLP"), and circular welded pipe ("CWP") -- based on the same four factors.

Id. at 11.[8]

Petitioners further alleged that Plaintiffs' home markets should be considered not viable

due to the PMS allegation, and that Commerce should therefore use constructed value as the basis

for the product's normal value calculation.  IDM at 27 n.96 (citing Petitioners' Letter, re: Heavy-

Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Market

Viability Allegations as to DOSCO and HiSteel (Feb. 22, 2018)).

## B.  *Preliminary Results*

On October 10, 2018, Commerce published its preliminary results.  Heavy Walled

Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Preliminary

Results of Antidumping Duty Administrative Review and Preliminary Determination of No

---

[8] See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014–2015, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) and accompanying Issues and Decision Mem.; Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015–2016, 83 Fed. Reg. 17,146 (Dep't Commerce April 18, 2018) and accompanying Issues and Decision Mem.; Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015–2016, 83 Fed. Reg. 27,541 (Dep't Commerce June 13, 2018) and accompanying Issues and Decision Mem.; Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015–2016, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) and accompanying Issues and Decision Mem.; and Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 83 Fed. Reg. 43,651 (Dep't Commerce Aug. 27, 2018) and accompanying Prelim. Decision Mem.

Case 1:19-cv-00104-GSK   Document 68   Filed 10/01/20   Page 12 of 50

Consol. Court No. 19-00104                                                    Page 12
*PUBLIC VERSION*

Shipments; 2016–2017, 83 Fed. Reg. 50,892 (Dep't Commerce Oct. 10, 2018), P.R. 211

("Preliminary Results") and accompanying PDM.  Commerce preliminarily determined that the

sale of Korean HWR in the U.S. had been made at prices below normal value.  PDM at 1.

Commerce also determined that a PMS in Korea distorted the cost of producing HWR, in line with

Petitioners' earlier allegations.  Id. at 13.  In reaching this conclusion, Commerce, as it had done

in its previous determinations that found the existence of a PMS in Korea, analyzed the four factors

raised by Petitioners based "on a totality of the circumstances," rather than relying on any one

factor.  Id.  Though Commerce determined that the PMS for Korean HWR resulted from the

"collective impact" of the four factors, Commerce also determined that only the first factor --

government subsidization of HRC inputs -- could be properly quantified and therefore properly

adjusted for.  Id.  Thus, Commerce applied a PMS adjustment based only on estimated subsidy

rates obtained from prior studies of the Korean government's subsidization of HRC calculated in

a previous countervailing duty determination.  Id. (citing Certain Hot-Rolled Steel Flat Products

from Brazil and the Republic of Korea: Amended Final Affirmative Countervailing Duty

Determinations and Countervailing Duty Orders, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3,

2016)).  In so doing, Commerce adjusted DOSCO's reported input costs in proportion to the

company's HRC purchases from subsidized suppliers.  Id. at 20.  However, Commerce disagreed

with Petitioners that the PMS determination necessarily demonstrated a lack of market viability,

and therefore Commerce used home market sales, rather than CV, as the basis for the normal value

calculations.[9]  See id. at 14.  In its Preliminary Results, Commerce also calculated DOSCO's AD

---

[9] As noted by Commerce, the agency's "viability regulation is found at 19 C.F.R. § 351.404."
IDM at 29.  Subsection (b) of the regulation in particular states:

    (1) The Secretary will  consider  the  exporting  country  or  a third  country as
        constituting a viable market if the Secretary is satisfied that sales of the foreign

margin based on its reported theoretical weights of sales of subject merchandise, rather than using

DOSCO's preferred "theoretical actual" (henceforth, actual) weights of sales.[10]   See PDM at 9;

see also IDM at 34.   Additionally, Commerce preliminarily determined that DOSCO was not

entitled to a CEP offset on the basis of alleged differences in sophistication of the LOTs between

its home and export markets.   PDM at 17–18.

### C.   Final Results

In response to the Preliminary Results, Petitioners, DOSCO, and HiSteel filed case briefs

with Commerce in November 2018.   See IDM at 2; Letter from DOSCO to Sec'y of Commerce,

re: Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea

– Case Brief (Nov. 28, 2018), P.R. 218 ("DOSCO's Case Brief").   Commerce received rebuttal

briefs from the same parties one month later.   IDM at 2; Letter from DOSCO to Sec'y of

Commerce, re: Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the

Republic of Korea – Rebuttal Brief (Dec. 3, 2018), P.R. 221 ("DOSCO's Rebuttal Brief").

Commerce issued its Final Results in May 2019.   Final Results; IDM.   In it, Commerce sustained

---

like product in that country are of sufficient quantity to form the basis of normal value.

(2) "Sufficient quantity" normally means that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by an exporter or producer in a country is 5 percent or more of the aggregate quantity (or value) of its sales of the subject merchandise to the United States.

19 C.F.R. § 351.404(b)(1–2).   And, "absent a reason to do otherwise, Commerce's normal practice would be to use home market sales as the basis for [normal value]."   IDM at 29.

[10] Both theoretical and "theoretical actual" weights are calculated by scaling the product's dimensions by its density, using the same "standard industry formula," with the only difference being the value used for the "thickness" component.   IDM at 34.   "Theoretical weight . . . is based on the thickness of the final HWR product and 'theoretical actual' weight uses the thickness of the input steel coil used to produce HWR."   Id.   Neither metric captures the "actual measured weight" of the final HWR product itself, since "DOSCO does not weigh its products either after production or prior to shipment."   Id.   Rather, both serve as approximations for actual measured weight.

its earlier determination that a PMS existed with respect to the cost of HRC inputs for HWR from

Korea.  Id.  Commerce also reaffirmed its view that a PMS adjustment to Plaintiffs' cost of

production was quantifiable and statutorily valid, but in a change from the Preliminary Results,

reduced the PMS adjustment to more accurately reflect the net subsidy rate.  IDM at 3.  As part of

the final PMS determination, Commerce affirmed its view that Korea did not lack home market

viability.  Id.

 In its case brief, DOSCO challenged Commerce's PMS determination.  DOSCO contended

that the TPEA would allow Commerce to apply a PMS adjustment only when using a price-to-

constructed value comparison, but not to the calculation of COP as Commerce had done in its

Preliminary Results.  DOSCO's Case Br. at 5–7.  DOSCO further argued that Commerce's PMS

determination was unsupported by the record because Commerce reached this conclusion only

after relying heavily on findings from prior cases involving different products.  Id. at 7–13.

DOSCO finally asserted that any PMS adjustment applied, should be drawn from the

contemporaneous countervailing duty administrative review of Hot Rolled Steel from Korea to

capture the most contemporaneous net subsidy rate data.  Id. at 15–18.  Petitioners by contrast

argued that Commerce's PMS adjustment, by only capturing the effect of the government subsidy,

in fact failed to address the full extent of the distortions created by the PMS.  IDM at 8–9

(summarizing Petitioners' comments on PMS in Korea).  Petitioners instead suggested alternative

methodologies for calculating a more fulsome PMS adjustment value.  See id. at 9.  DOSCO

responded that Petitioners' proposed alternatives for estimating the appropriate PMS adjustment

were untenable as a matter of law.  DOSCO's Rebuttal Br. at 9–11.

 Commerce likewise affirmed its use of theoretical rather than actual weights to estimate

DOSCO's dumping margin and restated its decision that a CEP offset was not warranted.  Id. at

304–35; 38–41.  In its case brief, DOSCO contended that Commerce introduced distortions into

its AD margin calculations when it relied on the theoretical, rather than actual, weight of DOSCO's

finished products, DOSCO's Case Brief at 29–33, to which Petitioners responded that DOSCO's

claim of such distortion was unsupported by compelling evidence, IDM at 33(summarizing

Petitioners' rebuttal comments).  Finally, DOSCO argued that it was entitled to a CEP offset as a

result of a more advanced home market LOT than its CEP LOT, which DOSCO argued was

evidenced by the different quantity, authority, and functions of its sales personnel in the home and

U.S. markets.   DOSCO's Case Brief at 33–39.   Petitioners responded by pointing to the

"subjective" nature of DOSCO's own assessments regarding the intensity of sales activity

conducted for home market versus CEP LOTs.  IDM at 37 (summarizing Petitioners' comments

on CEP offset).

In a change from its Preliminary Results, Commerce altered Plaintiffs' reported raw

material costs in the Final Results, following Petitioners' comments regarding the differences in

DOSCO's reported COP figures for similar CONNUMs.  Id. at 42.  Petitioners noted that DOSCO

reported different costs for products with similar control numbers ("CONNUMs").[11]  IDM at 42

(summarizing Petitioners' comments regarding DOSCO's reported CONNUMs).  For this reason,

Petitioners argued that Commerce should apply an additional adjustment to the adjustments

provided in the Preliminary Results.   Id.   DOSCO responded that no further adjustment was

required, since the cost differences were either so small as to be negligible, or else could be

explained by differences in the manufacturing process.  DOSCO's Rebuttal Brief at 18.

---

[11] Sales of individual products are denominated by product control numbers denoted as
"CONNUM" entries.

*PUBLIC VERSION*

### D.    Procedural History

DOSCO initiated this litigation on June 25, 2019, challenging the portions of Commerce's

Final Results pertaining to the calculation and adjustments of Plaintiffs' AD margins.  Summons,

ECF No. 1; Compl. at 6, ECF No. 6.  Kukje commenced a separate action against the Government

to challenge Commerce's final determination, filing a summons and complaint on June 25, 2019.

Kukje's Summons, Kukje v. United States, No. 19-105 (CIT filed June 25, 2019), ECF No. 1;

Kukje's Compl., Kukje, No. 19-105, ECF No. 6.  On August 5, 2019, the court granted consent

motions to allow Defendant-Intervenors Atlas Tube, Searing Industries, and Nucor Tubular

Products Inc. ("Nucor") to intervene in both cases.  Kukje, No. 19-105, ECF Nos. 28, 29; Ct.

Orders Granting Consent Mot. to Intervene as Def.-Inter., ECF Nos. 23, 24.  On August 6, 2019,

the parties filed a motion to consolidate Kukje's action (No. 19-105) with the lead case brought by

DOSCO.  Joint Mot. to Consol. Cases, ECF No. 25.  The court granted the motion on August 13,

2019.  ECF No. 26.

On November 6, 2019, Plaintiffs filed a Rule 56.2 motion for judgment on the agency

record to challenge the Final Results.  Pl.'s Br.; Consol. Pl.'s Br.  The Government and Defendant-

Intervenor Nucor responded in opposition to Plaintiff's motion.  Def.'s Resp. to Pls.' Mot. for J.

Upon the Agency R., Mar. 3, 2020, ECF No. 43 ("Def.'s Br."); Def.-Inter. Nucor's Resp. Br., Mar.

3, 2020, ECF No. 44 ("Def.-Inter.'s Br.").  Plaintiffs subsequently replied.  Reply of Pl., DOSCO,

to Def.'s and Def.-Inters.' Mem. in Opp'n to Pl.'s' Rule 56.2 Mot. for J. on the Agency R., Mar.

26, 2020, ECF No. 46 ("Pl.'s Reply"); Reply of Consol. Pl. Kukje, Mar 26, 2020, ECF No. 47

("Consol. Pl.'s Reply").  In advance of oral argument, the court presented questions to which the

parties responded in writing.  See Ct.'s Letter Regarding Questions for Oral Arg., July 8, 2020,

ECF No. 53;  Pls.' Resp. to Questions for Oral Arg., July 14, 2020, ECF No. 55; Def.'s Resp. to

the Ct.'s Questions for Oral Arg., July 14, 2020, ECF No. 58 ("Def.'s Resp. to the Ct.'s

Questions"); Def.-Inter. Nucor's Resp. to Ct.'s Questions for Oral Arg., July 14, 2020, ECF No.

57.  Oral argument was held on July 16, 2020 via teleconference.  ECF No. 59.  Parties provided

post-oral argument submissions on July 20, 2020.  Pls.' Additional Comments Following Oral

Arg., ECF No. 62; Def.'s Post-Oral Arg. Submission, ECF No. 60; Def.-Inter. Nucor Resp. to Ct.'s

Req. for Additional Submission, ECF No. 61.

## JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), 19 U.S.C. §

1516a(a)(2)(A)(i)(II) and 19 U.S.C. § 1516a(a)(2)(B)(i).  The standard of review in AD duty

proceedings is governed by 19 U.S.C. § 1516a(b)(1)(B)(i), which provides that "[t]he court shall

hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  Agency determinations must

be supported by substantial evidence.  Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed.

Cir. 1984).  Substantial evidence "has been defined as 'more than a mere scintilla,' as 'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Ta

Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The substantiality of evidence must

account for anything in the record that reasonably detracts from its weight.  CS Wind Vietnam Co.

v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United

States, 132 F.3d 716, 720 (Fed. Cir. 1997)).  This includes "contradictory evidence or evidence

from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A.

v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB,

340 U.S. 474, 487 (1951)).  Commerce must also examine the record and provide an adequate

explanation for its findings such that the record demonstrates a rational connection between the

facts accepted and the determination made.  See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Jindal Poly Films Ltd. of India v. United States,

43 CIT __, __, 365 F. Supp. 3d 1379, 1383 (2019).  Commerce's findings may still be found to be

supported by substantial evidence despite the possibility that two inconsistent conclusions may be

drawn from the record.  Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370,

1373 (2012).  However, agencies act contrary to law if their decision-making is not reasoned.

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167−68 (1962).

Additionally, to determine whether Commerce's interpretation and application of a statute

"is in accordance with the law," the court must apply the two-step test laid out in Chevron, U.S.A.,

Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  Under Chevron,

> [f]irst, always, is the question [of] whether Congress has directly spoken to the
> precise question at issue.  If the intent of Congress is clear, that is the end of the
> matter; the court, as well as the agency, must give effect to the unambiguously
> expressed intent of Congress.  If, however, the court determines Congress has not
> directly addressed the precise question at issue, the court does not simply impose
> its own construction on the statute, as would be necessary in the absence of an
> administrative interpretation.  Rather, if the statute is silent or ambiguous with
> respect to the specific issue, the question for the court is whether the agency's
> answer is based on a permissible construction of the statute.

467 U.S. at 842–43.  Deference to an agency's interpretation of a statute is only required under

Chevron when that interpretation is reasonable.  Koyo Seiko Co. v. United States, 36 F.3d 1565,

1573 (Fed. Cir. 1994).

## DISCUSSION

Plaintiffs moved for judgment on the agency record, arguing that: (1) Commerce's PMS

determination was unsupported by substantial evidence, Pl.'s Br. at 9; (2) even if the PMS

determination was valid, Commerce improperly interpreted and applied section 504 of the TPEA

when imposing an additional cost-based PMS adjustment, id. at 10; (3) Commerce's use of theoretical rather than actual weights for the calculation of DOSCO's AD margin introduced distortions in contravention of Commerce's obligation to maximize accuracy, id. at 28; (4) Commerce erred in determining that DOSCO was not entitled to a CEP offset, id. at 33; and (5) Commerce's decision to adjust DOSCO's reported raw costs in the calculation of DOSCO's AD margin was unsupported by substantial evidence on the record, id. at 39. See also Consol. Pl.'s Br. at 3.[12] Plaintiffs' arguments are largely consistent with the points raised in the comments to the Preliminary Results.

The Government responds that: (1) Commerce's PMS determination was supported by substantial evidence and in accordance with law, Def.'s Br. at 8; (2) Commerce properly determined that section 504 of the TPEA grants statutory authority to Commerce to make PMS adjustments to cost of production outside of a constructed value-to-price comparison methodology, id. at 12; (3) Commerce's calculation of DOSCO's margins using theoretical rather than actual weights was supported by substantial evidence on the record and in accordance with law, id. at 25; (4) Commerce properly determined that DOSCO was not entitled to a CEP offset, id. at 29; and (5) Commerce correctly found that DOSCO's reported raw material costs warranted adjustment, id. at 34. See also Def.-Inter.'s Br. at 1.[13]

The court grants Plaintiffs' motion for judgment on the agency record with respect to the first two issues. For the reasons discussed below, the court holds that Commerce's PMS

---

[12] Kukje indicated its support for DOSCO's motion and arguments before this court. Consol. Pl.'s Br. at 3. Kukje explained that it "was assigned a final [AD] duty margin that was an average of the rates assigned to mandatory respondents" and thus requests "any relief granted to DOSCO as a result of this appeal." Id.

[13] Nucor responds to Plaintiffs first issue and "incorporate[s] by reference the arguments made by the United States in its Response Brief." Def.-Inter.'s Br. at 2.

determination was not supported by substantial evidence.  Thus, the court remands to Commerce

its PMS determination and adjustment.  In the interest of judicial economy, the court also addresses

the issue of statutory interpretation.  The court holds that Commerce applied an impermissible

interpretation of section 504 of the TPEA in applying the PMS adjustment; the plain meaning of

the statute delineates narrow circumstances under which PMS adjustments may be applied.  The

first two issues notwithstanding, the court affirms the remaining three determinations made by

Commerce and challenged by Plaintiffs.

### I.     *Commerce's PMS Determination Was Unsupported by Substantial Evidence.*

In its Final Results, Commerce determined that a PMS existed for HRC in Korea, which

distorted the cost of production of Korean HWR.  IDM at 13.  Commerce reached this conclusion

"based on the collective impact of Korean HRC subsidies, Korean imports of HRC from China,

strategic alliances, and government involvement in the Korean electricity market."  Id.  In support

of its PMS finding, Commerce drew on its recent determinations on OCTG, CWP, WLP, and large

diameter line pipe ("LDWP"), in which "the same four factors" were found to support a PMS

determination.  Id. at 15 (citations omitted).

Plaintiffs argue that Commerce's PMS determination was erroneous, as it relied "heavily"

on Commerce's prior determinations that this court determined were not based on substantial

evidence.  Pl.'s Reply at 7–8 (citing Nexteel Co. v. United States, 43 CIT __, 355 F. Supp. 3d 1336

(2019) ("Nexteel I"); Nexteel Co. v. United States, 43 CIT __, 392 F. Supp. 3d 1276 (2019)

("Nexteel II"); Hyundai Steel Co. v. United States, 43 CIT __, 415 F. Supp. 3d 1293 (2019)

("Hyundai II")); Pl.'s Br. at 15–16.  Plaintiffs contend that Commerce thereby failed to meet the

substantial evidence burden.  Pl.'s Br. at 10.  See also Consol. Pl.'s Br. at 5 ("Because Commerce's

calculation of the final [AD] duty rate assigned to DOSCO was unsupported by substantial

evidence and otherwise not in accordance with law, Commerce's calculation of the review-specific

average rate assigned to Kukje[] as a non-examined company, which was based in part on

DOSCO's final [AD] rate, likewise was unsupported by substantial evidence and otherwise in

accordance with law."). The Government counters by arguing that the four factors it relied upon,

viewed together, constitute substantial evidence. Def.'s Br. at 18. See also Def.-Inter.'s Br. at 18–

19.

> ### A.    *The Nonprecedential but Influential Nexteel Line of Cases, Involving First Impression of a PMS Determination Made by Commerce Under Section 504 of the TPEA, Are Persuasive.*

For a valid PMS determination, substantial evidence must support a finding that "the costs

of materials and fabrication or other processing of any kind does not accurately reflect the cost of

production in the ordinary course of trade," thereby preventing Commerce from drawing accurate

comparisons in its calculation of appropriate AD margins. 19 U.S.C. § 1677b(e). Caselaw

involving PMS determinations under the TPEA is sparse. In fact, Nexteel I, on which Plaintiffs

rely, is a case of first impression on the matter. In Nexteel I, plaintiff Nexteel challenged

Commerce's determination that a PMS existed with regard to Korean HRC. 355 F. Supp. 3d at

1346. In its 2014–2015 administrative review of OCTG imported from Korea, Commerce

determined the existence of a single PMS in Korea on the basis of four factors -- (1) government

subsidization of Korean hot-rolled steel products; (2) the distortive pricing of unfairly traded HRC

from China; (3) strategic alliances between Korean HRC suppliers and Korean HWR pipes and

tubes producers; and (4) distortive government control over electricity prices in Korea. Certain

Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty

Administrative Review; 2014–2015, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) and

accompanying Issues and Decision Mem. ("OCTG from Korea 14–15"). Commerce previously

declined to find the existence of four separate PMSs, one for each cited factor.  Nexteel I, 335 F.

Supp. 3d at 1346.  The court at the time held it "unreasonable that Commerce reversed its position

and subsequently found a particular market situation based on the same evidence.  It does not stand

to reason that individually, the facts would not support a particular market situation, but when

viewed as a whole, these same facts could support the opposite conclusion."  Id. at 1351.

Consequently, the court held Commerce's PMS determination with respect to OCTG products

from Korea to be unsupported by substantial evidence.  Id.

     In its subsequent 2015–2016 administrative review of the same matter, Commerce again

affirmed the existence of a PMS in Korea.  Certain Oil Country Tubular Goods from the Republic

of Korea: Final Results of Antidumping Duty Administrative Review; 2015–2016, 83 Fed. Reg.

17,146 (Dep't Commerce Apr. 18, 2018) ("OCTG from Korea 15–16") and accompanying Issues

and Decision Mem.  In so doing, "Commerce relied on its prior finding of the existence of a

particular market situation in the first administrative review and continued to find in this

administrative review that the circumstances remain 'largely unchanged.'"  Nexteel II, 392 F.

Supp. 3d at 1287.  As a result, the court again held that the PMS determination was unsupported

by substantial evidence.  Id. at 1288.

     The arguments raised by Plaintiffs here are similar in nature to those raised by the plaintiffs

in Nexteel I and Nexteel II.  Plaintiffs note that, by Commerce's own admission, "the

circumstances present during this review -- that is, the PMS allegation itself and the record

evidence concerning the allegation -- remained largely unchanged from those that led to the finding

of a PMS in Korea in the other reviews."  IDM at 13 (citing OCTG from Korea 14–15; OCTG

from Korea 15–16) (emphasis added).  The language used by Commerce in its administrative

review of the Order here -- referencing the "largely unchanged" nature of the "record evidence" -

- identically mirrors the language used by Commerce in the administrative review that gave rise to

Nexteel II.  See 392 F. Supp. 3d at 1287.  Thus, the record evidence that Commerce relies upon to

support its PMS determination here appears to be consistent with the evidence from prior

administrative reviews, which the court has held to be insufficient to satisfy the substantial

evidence burden.

The Government argues in response that Nexteel I and Nexteel II are distinguishable and

non-binding.  Def.'s Br. at 20–22.  While it is true that those decisions are non-binding, the court

has determined that those earlier decisions are informative and persuasive here.  Moreover, the

court notes that neither the Government nor Nucor offers more persuasive or binding case law as

an alternative.

### B.      *Hyundai II is also Persuasive for Plaintiffs.*

Following Nexteel I and Nexteel II, the court was presented once more with a case

involving a PMS determination under the TPEA.  In its 2018 suit, plaintiff Hyundai contended

that, in finding the existence of a PMS in Korea with regard to CWP, Commerce improperly relied

on "the same insufficient facts and record evidence" that had formed the basis for the PMS

determination in OCTG from Korea 14–15, and since rebuked by the court in Nexteel I and Nexteel

II.  Hyundai II, 415 F. Supp. 3d at 1297; Circular Welded Non-Alloy Steel Pipe from the Republic

of Korea: Final Results of Antidumping Duty Administrative Review; 2015–2016, 83 Fed. Reg.

27,541 (Dep't Commerce June 13, 2018) and accompanying Issues and Decision Mem.  In

response to this claim, the court reiterated that "because Commerce's original finding of

a [PMS] was not supported by substantial evidence [in Nexteel I], . . . Commerce's finding of

a [PMS] in the second administrative review was not supported by substantial evidence" in

Nexteel II.  Hyundai II, 415 F. Supp 3d at 1299.  It follows that, as "Commerce's finding of

a [PMS] in the instant review was based upon 'the same evidence . . . on the record,' the court is

compelled to conclude that Commerce's finding of a [PMS] in the instant review is also not

supported by substantial evidence." Id. at 1300 (citations omitted).

Plaintiffs in the immediate action raise a nearly identical claim as the plaintiff in Hyundai

II. Plaintiffs first note that the PMS allegation in Hyundai II was "substantively the same" as the

PMS allegation raised in OCTG from Korea 14–15. Pl.'s Reply at 8 (citing Hyundai II, 415 F.

Supp. 3d at 1300). Plaintiffs then observe that, in Commerce's own words, "the facts in this review

are largely identical to the facts in [OCTG from Korea 14–15]." Id. (quoting IDM at 15). Under

the court's holding in Hyundai II, record evidence that is "largely identical" or "virtually the same"

to that raised in OCTG from Korea 14–15 will not support a PMS determination. 415 F. Supp. 3d

at 1300. Since "the same evidence is on the record" here, Commerce's PMS determination with

respect to this administrative review appears likewise unsupported by substantial evidence. See

IDM at 15. While the Government correctly argues that Hyundai II is non-precedential, Def.'s Br.

at 21–22, the court finds it to be persuasive. Again, the Government nor Nucor offers any more

persuasive or binding case law on the matter.

### C.    *The Government's Arguments Are Uncompelling.*

The Government argues that, despite this court's earlier rulings, the court should find the

"confluence" of the four factors, viewed in "totality of the record evidence," to meet the requisite

evidentiary burden, even though only one of the factors is directly quantifiable. Def.'s Br. at 18,

20. The Government here articulates the view that the four factors, though spelled out individually,

are necessarily interrelated and that they "represent[] facets of a single [PMS]." Id. at 18.

Similarly, Nucor argues that no standard exists which requires Commerce to quantify and analyze

each factor individually. Def.-Inter.'s Br. at 19–20.

The Government further argues that, in addition to being non-binding, Nexteel I and

Nexteel II, as well as Hyundai II, can all be distinguished from the immediate case.  Id. at 21.  In

Nexteel I, the court found it "unreasonable that Commerce reversed its position," between the

publication of the preliminary and final results as to the existence of a PMS in Korea.  Nexteel I,

355 F. Supp. 3d at 1351.  The Government contends that the reversal of position, rather than the

evidentiary support for a PMS finding (or lack thereof), constituted the crux of the Nexteel holding.

Def.'s Br. at 21.  Under the Government's view, since Commerce here made an affirmative PMS

determination in its Preliminary Results, which it sustained in its Final Results, there was no

reversal of position, and "notwithstanding that Commerce compared the record here to that of

Nexteel I, this is a fundamentally different case."  Id.  The Government further argues that, since

the outcomes of Nexteel II and Hyundai II were both derived from the holding in Nexteel I, the

latter cases also turned on the reversal of Commerce's initial PMS determination, rather than on

the record evidence.  Id.  The Government's argument here is unpersuasive.  Though the court

indeed found it "unreasonable that Commerce reversed its position," the court's holding (that the

PMS determination was unsupported by substantial evidence) was ultimately based on the lack of

record evidence, which did not change between the preliminary and final results of the

administrative review.  Nexteel I, 355 F. Supp. 3d at 1349–51 ("Commerce failed, however, to

substantiate its finding of one particular market situation with evidence on the record.").  The

record evidence (or rather, lack thereof) which was the underlying basis for the court's decisions

in Nexteel II and Hyundai II also serves as the record evidence in the immediate case.  This overlap

is more dispositive than any reversal in position made by Commerce between the preliminary and

final results.

While Commerce acknowledged that "the same evidence is on the record of this review," IDM at 12, it argued that the facts available here are more complete than in previous proceedings, a claim that the Government repeats.  IDM at 18–19; Def.'s Resp. to the Ct.'s Questions at 5 ("[T]his record contains additional information supporting the four factors upon which Commerce determined a PMS exists").  This alone is insufficient -- the Government must additionally demonstrate that Commerce actually relied on the more expansive factual evidence in reaching the PMS determination.  Hyundai II, 415 F. Supp. 3d at 1300 ("Despite the more expansive record, . . . Commerce relied upon virtually the same record evidence that was present in the [earlier] OCTG record").  Commerce is entitled to a presumption that it has "considered all of the record evidence," absent a showing to the contrary.  Jacobi Carbons AB v. United States, 43 CIT __, __, 422 F. Supp. 3d 1318, 1325 n.10 (2019) (citing Siemens Energy, Inc. v. United States, 38 CIT __, __, 992 F. Supp. 2d 1315, 1324 (2014), aff'd, 806 F.3d 1367 (Fed. Cir. 2015)).  However, a presumption of consideration differs markedly from a demonstration of actual reliance on the evidentiary record.  Here, Commerce did place the evidence on the record, but, despite what Commerce or the Government may argue, it is clear from the reasoning provided by Commerce itself that the PMS determination was predicated on the "largely unchanged," "largely identical," "same" record evidence from the prior proceedings.  IDM at 13, 15; see Background supra Sec. I. (A.–B.).

Even barring Commerce's "largely unchanged" language in the IDM, it is apparent that Commerce nonetheless drew heavily on the same record evidence from prior administrative reviews to reach its determination here.  Compare Petitioners' PMS Allegation at 11 (arguing that "[a]s it found with respect to OCTG, WLP, and CWP . . . , and preliminarily for LDWP from Korea, [Commerce] here should find that a PSM exists in Korea" for HWR), id. at 15–23 (describing the nature of the exhibits associated with the PMS allegation, including that many from

Case 1:19-cv-00104-GSK   Document 68   Filed 10/01/20   Page 27 of 50

Consol. Court No. 19-00104                                                                                    Page 27
*PUBLIC VERSION*

earlier administrative proceedings implicated in Nexteel I, Nexteel II, and Hyundai II), and id. at

23 (acknowledging that "evidence for this review [includes] evidence considered by [Commerce]

in the first and second administrative reviews of OCTG from Korea, the first administrative review

of WLP from Korea, the 2015–2016 administrative review of CWP from Korea, and the

investigation on LWP from Korea") with IDM at 12–19 (relying on the PMS Allegation exhibits,

which refer back to the prior administrative reviews, or directly invoking the prior administrative

reviews to defend the PMS determination with regard to Korean HWR).

> ### D.   *The Original Record Evidence Was and Remains Insufficient To Constitute Substantial Evidence.*

Commerce, by its own admission and contrary to the arguments raised by the Government,

relied on substantially the same record evidence in reaching its PMS determination here as

underlay earlier administrative reviews.  Applying the court's reasoning in Nexteel I, Nexteel II,

or Hyundai II the court therefore finds, again, that the record evidence fails to meet the substantial

evidence burden.  As an example of the overlap in record evidence, the court takes Commerce's

argument that the distortive influx of cheaply priced Chinese HRC contributes to the existence of

a PMS.  IDM at 13.  As evidence that this influx "plac[es] downward pressure on Korean domestic

steel prices," Commerce relied upon Exhibits 2–5 of the Petitioners' PMS Allegation.  Id.

Problematically, each of these exhibits simply constitutes portions of the record evidence from

Commerce's prior administrative reviews (Exhibit 2 is the IDM for OCTG from Korea 14–15;

Exhibit 3 is the IDM for OCTG from Korea 15–16; Exhibit 4 is the IDM for Commerce's 2015–

2016 administrative review of CWP from Korea; Exhibit 5 is the IDM for Commerce's first

administrative review of WLP from Korea).  Petitioners' PMS Allegation at 17–20.  By relying on

previous record evidence that the court already deemed insufficient to meet the substantial

evidence standard, Commerce merely incorporates and accentuates the flaws the court previously

Case 1:19-cv-00104-GSK   Document 68   Filed 10/01/20   Page 28 of 50

Consol. Court No. 19-00104                                              Page 28
*PUBLIC VERSION*

identified.  Regarding the unfairly traded HRC from China, for example, Commerce previously,

and again here, neglected to clarify whether the rise in steel exports from China is a trend "unique

to Korea."  See Nexteel I, 355 F. Supp. 3d at 1350 (citation omitted).  Otherwise, "[t]he potential

broad effect on prices creates a situation outside the scope of a [PMS], as the impact of Chinese

exports in the Korean market [may] also [be] reflected in other markets across the world."  Id.

(quotation omitted).  By the same logic, similar flaws may be identified regarding the other three

factors. [14]

     Accordingly, the court grants Plaintiffs' motion as to the PMS determination and remands

this determination to Commerce.

---

[14] The Government contends that the record evidence "contains additional information supporting
the four factors upon which Commerce determined a PMS exists."  Def.'s Resp. to the Ct.'s
Questions for Oral Arg. at 5.  The Government provided examples of such additional record
evidence available to Commerce:

- Global Trade Monitor reports on steel exports (Exhibits 40 and 41);
- Global Trade Atlas data on Chinese exports of hot-rolled steel and Korean imports
  of hot-rolled steel (Exhibits 44–47);
- Additional articles and reports on the global overcapacity of steel (Exhibits 54, 57,
  59, 60);
- POSCO's earnings during the period of review (Exhibits 55, 67),
- Information about POSCO's and Hyundai steel merger (Exhibits 71, 72);
- Regression analysis to estimate the effect of global excess capacity of steel on
  Korean hot-rolled steel imports (Exhibit 82); and
- Decisions of the Korea Fair Trade Commission (Exhibits 95–103), and information
  on electricity rates (Exhibits 106–108) and operating losses of Korean electricity
  providers (Exhibits 104, 105, and 118).

Id.  However, Commerce did not invoke these exhibits, except the Decisions of the Korea Fair
Trade Commission, in explaining its PMS determination in the IDM.  See IDM at 15–17 nn.54–
55 (citing to Exhibit 9, a memorandum from the earlier Hot Rolled Steel from Korea countervailing
duty investigation), n.57 (citing to Exhibits 2–5), n.65 (citing to Exhibit 9), n.67 (citing to Exhibits
31, 77, materials from the earlier LDWP and OCTG investigations), and n.69 (citing to Exhibit 4,
the IDM from CWP).

## II.     Commerce's Application of Section 504 of the TPEA To Impose a PMS Adjustment Outside the Context of a Price-to-Constructed Value Comparison Is Not in Accordance with Law.

On the basis of its PMS determination, Commerce applied an upward adjustment to the AD margin calculations.  Plaintiffs argue that, even if the PMS determination was valid, the adjustment was procedurally deficient under relevant provisions of the TPEA.  Pl.'s Br. at 9, 11.  The Government and Nucor contend in response that Congress intended the TPEA to broadly empower Commerce to make PMS adjustments.  Def.'s Br. at 13; Def.-Inter.'s Br. at 3–4.

The question of procedural adequacy only becomes an issue if, upon remand, Commerce determines that its PMS determination was supported by substantial evidence beyond the evidence cited in the IDM and that Commerce actually relied on that evidence.  Nevertheless, in the interests of judicial economy, the court addresses the issue here.

### A.     Section 504 of the TPEA May Not Be Applied to Commerce's AD Calculations Outside of a Price-to-CV Calculation.

Plaintiffs, the Government, and Nucor are correct that the crux of this issue will largely turn on the interpretation and scope of the TPEA's provisions, in particular section 504.  Under Chevron, the court must first consider whether Congress has "directly spoken to the precise question at issue."  467 U.S. at 842–43.  To do so, the court may take into account the statutory structure and legislative history.  See Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998).  Both are raised by the parties and are discussed in turn below.

Plaintiffs advocate for a reading of the statute that aligns with the scope-of-subparts canon.[15]  Plaintiffs assert that TPEA section 504 authorizes Commerce to adjust a producer's

---

[15] The scope-of-the-subparts canon advocates for a reading of statutory text such that "[m]aterial within an indented subpart relates only to that subpart; material contained in unindented text relates to all the following or preceding indented subparts."  Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS xii (2012).

actual cost of production following a PMS allegation <u>only</u> when calculating an AD margin based

on a price-to-constructed value metric.  Pl.'s Br. at 11–12.  Plaintiffs note that, since Commerce

found the Korean home market viable in the <u>Final Results</u>, a price-to-price comparison

methodology was appropriate.  <u>Id.</u> at 10–11.  Plaintiffs allege that Commerce acted improperly by

deriving the PMS adjustment to the Plaintiffs' AD margin calculations by comparing "net U.S.

prices to above-cost, net home market prices (i.e., 'price-to-price comparisons')" rather than price-

to-constructed value comparisons.  <u>Id.</u>  Plaintiffs draw this conclusion by pointing to the text of

the TPEA.  Section 504(a) of the TPEA incorporated PMS determinations as a circumstance

existing outside of the ordinary course of trade (as set forth in 19 U.S.C. § 1677(15)(C)).  Section

504(b) amended the calculation of constructed value as defined in 19 U.S.C. § 1677b(e) to likewise

allow for PMS-specific adjustments.  19 U.S.C. § 1677b(e)(3).  Plaintiffs argue that since the

TPEA did not alter other statutory provisions, including the provisions specifically governing the

calculation of cost of production for sales-below-cost purposes, Congress "unambiguously

signaled" its intent to limit PMS adjustments of cost of production to cases involving only CV-

based calculations.  Pl.'s Br. at 12.

    In contrast, the Government argues that the court should apply the whole-text and

harmonious-reading canons to its interpretation of the TPEA.  Under this approach, the focus of

the court should be the statute's bigger picture.  The Government argues generally that Commerce

acted with proper statutory authority when it imposed the PMS adjustment.  Def.'s Br. at 12.  The

Government and Nucor note that 19 U.S.C. § 1677b mandates Commerce to achieve a fair

comparison between normal value and export price, and that this "broader statutory purpose of fair

comparison" requires Commerce to refrain from using distorted values in its margin calculations.

<u>Id.</u> at 13; Def.-Inter.'s Br. at 3.  More specifically, the Government contends that the language of

these provisions broadly tasks Commerce to use "non-distorted values in its comparisons of normal

value and export price, regardless of whether normal value is based on sales prices or a constructed

value." Def.'s Br. at 13. Thus, under the Government's view, Plaintiffs ignore the forest for the

trees. Additionally, the Government refers to the TPEA language allowing Commerce to employ

"any other calculation methodology" to estimate constructed value upon determining the existence

of a PMS. Id. at 16 (citing 19 U.S.C. § 1677(b)). It then argues it would be "illogical" to conclude

that Congress intended for Commerce to correct PMS distortions in the context of constructed

value but to disregard similar distortions when considering cost of production or the sales-below-

cost test, especially as "distortions prevent proper comparison whether normal value is based on

home market prices or constructed value." Id.[16] See also Def.-Inter.'s Br. at 8–9 (arguing that

Commerce did not intend to limit Commerce's flexibility in adjusting for a PMS, but instead that

it required Commerce to adjust for PMS").

The Government also advances the view that, by incorporating PMS determinations into

the definition of ordinary course of trade (spelled out in 19 U.S.C. § 1677(15)), Congress implicitly

authorized PMS determinations -- and corresponding PMS adjustments -- to be incorporated into

all portions of the statute that cite to 19 U.S.C. § 1677(15) or that invoke the "ordinary course of

---

[16] To further support its claim, the Government refers to the TPEA's legislative history, arguing it
demonstrates Congressional intent to give Commerce great "flexibility" over methodology so as
to avoid distortions in the calculation of prices and costs. Def.'s Br. at 14 (citing S. Rep. No. 114-
45, at 37 (2015)). The legislative history, the Government observes, "does not distinguish between
calculating a duty based on sales prices or constructed value." Id. Plaintiffs argue in response that
the legislative history cited by the Government constitutes "cherry-picked statements" that support
their conclusion only when coupled with "a tortured analysis of various statutory provisions," but
decline to present an alternative interpretation. Pl.'s Reply at 2. Even so, the Government's
argument is not persuasive. Where a statute is unambiguous, its interpretation need not turn on
legislative intent. Chevron, 467 U.S. at 842–43; Timex V.I., Inc., 157 F.3d at 882. Here, the
statute clearly describes the circumstances under which Commerce is authorized to find and adjust
for PMS determinations. As such, any debate over legislative history does not alter the outcome.

trade" language.  Def.'s Br. at 16.  See also Def.-Inter.'s Br. 3.  However, as noted by Plaintiffs,

the TPEA limited its definition of "outside the ordinary course of trade" to those "[s]ituations in

which the administering authority determines that the [PMS] prevents a proper comparison with

the export price or [CEP]."  19 U.S.C. § 1677(15) (emphasis added).  Thus, under Plaintiffs'

reading, the inclusion of the PMS clause into the statutory definition of "ordinary course of trade"

would be limited to circumstances where the PMS interferes with fair comparisons with export

price or CEP, but not with constructed value or other metrics.

      Although the interpretations raised by the parties appear defensible to a degree, the court

has previously adopted the narrower view advanced by the Plaintiffs, as discussed further below.

The court is also bound by precedent dictating that, "where 'Congress includes particular language

in one section of a statute but omits it in another section of the same Act, it is generally presumed

that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Thomas

v. Nicholson, 423 F.3d 1279, 1284 (Fed. Cir. 2005) (citing Russello v. United States, 464 U.S. 16,

23 (1983)).  This is complementary to the scope-of-subparts canon that Plaintiffs indirectly invoke.

Under such a presumption Plaintiffs' narrower interpretation is compelling, as it is presumed that

Congress intended to limit the circumstances under which a PMS determination would authorize

Commerce to apply an adjustment.  Plaintiffs' view is also more congruent with the purpose of

statutory interpretation as articulated by the Supreme Court.  Bd. of Governors of Fed. Reserve

Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373–74 (1986) ("Invocation of the "plain purpose" of

legislation at the expense of the terms of the statute itself takes no account of the processes of

compromise and, in the end, prevents the effectuation of congressional intent.")   (citations

omitted).

    **B.**    *Plaintiffs' Argument that the PMS Actually Constitutes Part of the "Ordinary Course of Trade" Is Unconvincing*

Plaintiffs observe that:

> Commerce first concluded that a PMS existed in [OCTG from Korea 14–15].  POR for the review at issue in this action ended in August 2017.  Thus, for a minimum of 37 months, Commerce has found that a PMS has existed in Korea that has distorted the cost of production.  In other words, Commerce itself has determined that for a period of three years and perhaps longer, the market situation in Korea is not unusual, but rather, actually represents "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal.

Pl.'s Br. at 17–18 (citation omitted).  On the basis of the longevity of this determination, Plaintiffs suggest that the very market situation that Commerce deems unusual is actually "normal" and therefore requires no correction.  Id.  However, Plaintiffs do not provide any statutory basis for this conclusion, and the Government notes that "[t]he statute contains no temporal limit for how long a PMS may exist."  Def.'s Br. at 23.  Nowhere in the language of the Tariff Act or the TPEA does Congress provide a maximum duration requirement for PMS determinations.  Moreover, a PMS by its very definition exists outside the "ordinary course of trade."  See 19 U.S.C. § 1677(15)(C).  Rather, Plaintiffs would read in an implied limitation to PMS determinations, whereby a sustained determination would eventually render itself void.  See Pls.' Resp. to Questions for Oral Arg. at 8–9.  Lacking a statutory basis for this conclusion, Plaintiffs' line of argument is not convincing.

    **C.**    *Persuasive Caselaw Supports Plaintiffs' Position.*

Plaintiffs also bolster their position -- "that Commerce is statutorily permitted to modify a respondent's reported costs under 19 U.S.C. § 1677b because of a PMS only when calculating normal value using [constructed value] under 19 U.S.C. § 1677b(e)" -- by referring to recent decisions by the court.  See, e.g., Pl.'s Reply at 3 (citing Saha Thai Steel Pipe Public Co. v. United

States, 43 CIT __, __, 422 F. Supp. 3d 1363, 1369 (2019) (citations omitted) (holding "unsupported

in the law" the "contention that Section 504 [of the TPEA] authorized Commerce's comparison of

U.S. prices to home-market sales instead of CV")).   The court finds Saha Thai to be persuasive

here.   As the court discussed in Saha Thai, the TPEA did not amend 19 U.S.C. § 1677b(b)(3)

defining cost of production; rather, it only directly modified 19 U.S.C. § 1677b(e) defining CV.

422 F. Supp. 3d at 1368.   For this reason, the court there held that PMS determinations made under

TPEA Section 504 do not authorize Commerce to make PMS adjustments outside the scope of a

price-to-constructed value calculation.   Id.   The Government offers little in way of reply, other

than to note that the Saha Thai decision is non-binding. Def.'s Br. at 17–18.   However, neither the

Government nor Nucor presents more persuasive alternative case law.

Similarly, Plaintiffs rely on Husteel Co. v. United States.   Pl.'s Br. at 4 (quoting Husteel

Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1387 (2020) ("[N]othing in the statutory

scheme . . . can be read to grant Commerce the authority to modify the below cost sales test to

account for a PMS.   Indeed, the statute precludes a PMS adjustment to [cost of production] for the

below cost sales analysis.") (citations omitted)).   The court in Husteel held that "Commerce is not

authorized to tinker with the below cost sales calculation because of a PMS.   No part of the [TPEA]

allows Commerce to use 'any other methodology' when market sales are used for normal value.

The 'any other methodology' language is reserved solely for when normal value is determined by

constructed value."   426 F. Supp. 3d at 1388.   The court in Borusan Mannesmann Boru Sanayi v.

Ticaret A.S., moreover, adopted the same reasoning, holding that Commerce's PMS adjustment

was contrary to law.   44 CIT __, __, 426 F. Supp. 3d 1395, 1411 (2020).   As the court noted, in

"recent and thorough opinions[,] the court has explained that no adjustment for a PMS is permitted

for the sales below cost test."   Id. (citing Husteel, 426 F. Supp. 3d 1376, and Saha Thai, 422 F.

Supp. 3d 1363).  The court determines that Husteel and Borusan are persuasive here.  As in Saha

Thai, the court in Husteel and Borusan applied a narrow interpretation of the circumstances under

which Commerce may make PMS adjustments.  As noted above, the Government similarly

declines to suggest any alternative case law.

The court in Husteel also held, regarding the ordinary course of trade language, that "[i]f a

PMS prevents a proper comparison with export price or CEP, sales would indeed be considered

outside the ordinary course of trade; as such, they shall be disregarded.  Alternatively, the existence

of the PMS would justify Commerce using third country sales or constructed value."  Husteel, 426

F. Supp. 3d at 1388.  In either case, Commerce would not be allowed to adjust the sales-below-

cost calculation on account of a PMS determination.  Because of the similar facts present here, the

court reaches the same conclusion.

In sum, the court determines that Saha Thai, Husteel, and Borusan are persuasive for the

determination of the case at bar.  Moreover, there is binding precedent that supports Plaintiffs'

narrower interpretation of the statutory limits of the TPEA.  See Thomas, 423 F.3d at 1284;

Russello, 464 U.S. at 23.  Accordingly, if Commerce decides on remand that a PMS exists, the

court remands the PMS adjustment determination to Commerce for a determination in accordance

with this opinion.

### III.     *Substantial Evidence Supports Commerce's Decision to Use Theoretical Rather than Actual Weights.*

In its Final Results, Commerce chose to use DOSCO's theoretical rather than actual

product weights.  IDM at 34–35.[17]  DOSCO alleges that Commerce not only failed to adequately

---

[17] In justifying its decision, Commerce provided:

> First, we are able to compare sales and costs on a consistent weight basis for
> DOSCO, as it provided theoretical weight data for its home market and U.S. sales,

justify its use of theoretical weights, but that in relying on the theoretical metric, Commerce

actually distorted its own calculation of DOSCO's AD duty margins in contravention of its

obligations under 19 U.S.C. § 1677b(a) to administer AD duty laws based on a "fair comparison .

. . between the export price or [CEP] and normal value."  DOSCO's Br at 26, 30.  In particular,

DOSCO reported that it agrees to quantity tolerances for its U.S. sales that are [[     ]] times larger

than tolerances for its home market sales, indicating the presence of meaningful variation in

theoretical weights.[18]  Id. at 31.  DOSCO also notes that its specific internal operating standards

tended to produce actual weights that erred, on the whole, toward the [[          ]] of the

tolerance spectrum.  Id. at 32.  Therefore, DOSCO argues that using theoretical weights

overinflates the true weight of the merchandise to which the AD duty margin is applied.

---

and cost databases based upon those theoretical weights.  Second, DOSCO's U.S.
customers order products based on nominal dimensions, and are invoiced on a
theoretical weight basis (not a "theoretical actual" weight basis).  Third, the
CONNUM, which is used to match sales in the home and U.S. markets, is created
from the nominal product dimensions as reported by DOSCO in its responses to
Commerce's questionnaire, and theoretical weight is derived from nominal
dimensions.  Accordingly, there is a correspondence between the product
CONNUM, i.e., the basis for market comparisons, and theoretical weight.  This
correspondence does not exist between the product CONNUM and "theoretical
actual" weight.  Finally, Commerce's methodology in this case has been upheld by
the CIT.

IDM at 34–35 (citations omitted).

[18]  The weighted average tolerance captures the average percentage difference between the
product's aggregate theoretical and aggregate actual quantities.  In practice, the tolerance
represents the variance between the product's theoretical and actual weight -- a lower tolerance
indicates that the theoretical and actual weights will be more similar, while a higher tolerance
indicates that the theoretical and actual weights will differ more meaningfully.  According to
DOSCO's submitted databases, the weighted-average tolerance over the period of review was [[
     ]] percent for the home market but [[     ]] for the U.S. market.  Pl.'s Br. at 31.  Further,
DOSCO asserts that its home market consumers generally agree to a tolerance within [[     ]]
percent while its sales to U.S. customers generally have a [[     ]] percent tolerance agreement.
Id.

In response, the Government notes that Commerce successfully relied on theoretical weights in past proceedings.  Def.'s Br. at 26.  Moreover, the Government emphasizes that "DOSCO's U.S. customers order products based on nominal dimensions (used to calculate theoretical weight), and are invoiced on a theoretical weight basis.  Thus, the use of theoretical weight is consistent with Commerce's general preference for making sales comparisons on the basis on which U.S. sales [are] made."  Id. (citations and quotations omitted).  The Government also argues that DOSCO's claims suffer on two counts: first, by failing to show that actual weights are any more accurate than theoretical weights, and second, by failing to demonstrate the precise nature or dimension of the distortions allegedly arising from Commerce's use of theoretical weights.  Id. at 28.  Finally, the Government argues that, barring a clear mandate from Congress, Commerce is free to "perform its duties in the way it believes most suitable," including in the selection of theoretical or actual weights for the calculation of AD margins.  Id. (citing JBF RAK LLC v. United States, 790 F.3d 1358, 1363 (Fed. Cir. 2015)).  The reasonable exercise of Commerce's discretion, however, remains subject to the substantial evidence standard.

### A.   *Persuasive Case Authority of* *Dong-A Steel*

The parties note that Commerce has in prior instances relied on theoretical weights and actual weights alike and has successfully converted between the two without issue.  See DOSCO's Case Brief at 29–33; Def.'s Br. at 26.  Given this pattern, DOSCO argued that Commerce "does not have a stated preference" for using either actual or theoretical weights, but rather uses whichever metric best serves its mandate for drawing a fair comparison.  DOSCO's Case Brief at 33.  In response, the Government notes Commerce's preference for comparing prices based on U.S. sales.  Def.'s Br. at 26.  Further, the Government cites to this court's previous holding, on nearly identical facts, that "Commerce's decision to use theoretical weight is supported by

evidence on the record that U.S. customers ordered and were billed using nominal values."  Def.'s

Br. at 26 (citing <u>Dong-A Steel Co.</u>, 337 F. Supp. 3d at 1373).  There, based on identical facts --

that DOSCO's American customers placed orders and received invoices on a nominal (theoretical)

basis -- the court was convinced that Commerce met its substantial evidence burden.  <u>Dong-A</u>

<u>Steel Co.</u>, 337 F. Supp. 3d at 1373.  The court agrees.  That DOSCO's clients continue to place

orders and receive invoices on the same nominal, theoretical basis, is therefore compelling

evidence for finding Commerce's determination to be supported by substantial evidence in the

current proceeding.  Consequently, the court finds that Commerce's use of theoretical weights was

supported by substantial evidence.[19]

### B.      *Commerce Did Not Fail To Respond to All Material Issues*

Next, DOSCO argues that, because it negotiates selling prices on an actual weight basis,

the "commercial reality" is that "the theoretical weight stated on the invoice [is] presented solely

for the customer's purpose."  Pl.'s Br. at 29.  In response to a similar point raised by DOSCO in

its case brief, Commerce originally argued that "the record demonstrate[s] that such information

is not readily available."  IDM at 35.  The Government, too, responds that "DOSCO did not cite

to any record evidence, other than its own statements," in support of its claim "that the theoretical

actual weight was more reasonable than the theoretical weight used on the invoices."  Def.'s Br.

at 27 (citation omitted).  DOSCO takes issue with the Government's response, arguing that it

---

[19] DOSCO similarly argued that Commerce has, in past instances, "converted a respondent's U.S. sales from the basis on which the sales were made."  DOSCO's Case Br. at 30 (internal quotation and citation omitted).  While Plaintiffs are able to provide several examples of this behavior, they fall short of showing conclusively that Commerce, in certain cases, is compelled to convert a respondent's U.S. sales.  By DOSCO's own argument, Commerce has no preference for either actual or theoretical weights. <u>Id.</u> at 33.  Thus, Plaintiffs show at most that Commerce may, not that it must, convert DOSCO's invoiced theoretical weights to actual weights for the purpose of calculating AD margins

provided "narrative explanations in questionnaire responses, which are certified as accurate by company officials, [and which] constitute record evidence." Pls. Reply at 14. By disregarding such evidence, DOSCO seems to contend, Commerce failed to fulfill its obligation to discuss all arguments made by interested parties involving "issues material to the agency's determination." See Itochu Bldg. Products, 40 CIT __, __,163 F. Supp. 3d 1330, 1337 (2016).

Commerce, however, is not required to address every piece of evidence submitted by participating parties, and its determinations may be found to be supported by substantial evidence despite the possibility that two inconsistent conclusions may be drawn from the same record. Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373 (2012). For this reason, DOSCO's claim is unavailing. As discussed above, the simple fact that DOSCO transacted with clients on a theoretical weight basis is sufficient to constitute substantial evidence. That DOSCO's narrative explanations suggest a different conclusion does not detract from the weight of the former evidence. Moreover, as mentioned previously, Commerce is entitled to a presumption that it has, "absent a showing to the contrary, considered all of the record evidence." Jacobi Carbons, 422 F. Supp. 3d at 1325 n.10 (citations omitted). Neither Commerce's nor the Government's statements demonstrate that Commerce affirmatively ignored DOSCO's proffered narrative evidence. Indeed, the Government asserts that Commerce was in fact aware that DOSCO provided its "own statements" as evidence, yet nonetheless reached a different conclusion, suggesting that Commerce considered, but was unconvinced by, said evidence. Def.'s Br. at 27.[20]

---

[20] The Government raises some issues to which Plaintiffs provide no reply. For instance, the Government notes that "DOSCO uses theoretical weight in its normal books and records" and argues that it would be "highly unusual [for] DOSCO to use such a method in its bookkeeping if, as it alleges, that method led to distortion." Def.'s Br. at 28. DOSCO, in its reply brief, skirt this

In similar fashion, DOSCO challenges the Government's contention that "DOSCO fails to identify the precise nature of the distortion that purportedly results from the use of theoretical weight." Def.'s Br. at 28.  DOSCO argues that Commerce overlooks the "specific mathematical distortions that Plaintiff demonstrated to the agency using real examples." Pl.'s Reply at 15. Commerce indeed recognized that DOSCO provided such an analysis as part of its evidence, since the Government is able to cite to and recognize the relevant portions of DOSCO's Case Brief.  See Def.'s Br. at 28.  That Commerce nonetheless found that evidence uncompelling when making its final determination is not dispositive of a failure to meet the substantial evidence burden.  Rather, it merely points to a disagreement between the parties as to the meaning of what constitutes the "precise nature" of an alleged distortion.  Id.  For this reason, the court finds that Commerce responded to all material issues in determining to use theoretical weights.

In light of the above, the court sustains Commerce's determination to use converted theoretical weights rather than actual weights in the calculation of DOSCO's AD duties.

### IV.   *Commerce's CEP Offset Determination Is Reasonable and Supported by Substantial Evidence.*

Plaintiffs contend that "DOSCO performed significantly more selling activities to support its sales to home market customers than to support its sales to its U.S. affiliate . . . both in terms of number of selling activities and the intensity of the selling activities performed" and therefore deserved a CEP offset from Commerce for having home marketing that was more meaningfully developed than its foreign marketing. Pl.'s Br. at 3, 34.  The term "marketing stage" is not defined by statute.   Rather, Commerce's regulations provide that, "The Secretary will determine that sales are made at different [LOTs] if they are made at different marketing stages.  Substantial differences

---

issue, contending only that it provided evidence of "specific mathematical distortions" that, it alleges, Commerce overlooked.  Pl.'s Reply at 15.

in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." See 19 C.F.R. § 351.412(c)(2).[21]  That is, the regulation requires there to exist a difference in LOTs before differences in marketing stages may be found. However, a difference in LOTs may not, in and of itself, be enough to prove that differences in marketing stages exist.  Id.  Conversely, neither will common sales activity across LOTs necessarily preclude a finding that an exporter's home market sales were at a different stage than the exporter's foreign market sales. Id.  The party seeking a CEP offset ultimately bears the burden of demonstrating substantial differences in selling activities across the LOTs. See also 19 C.F.R. § 351.401(b)(1).  The court is unpersuaded by Plaintiffs' arguments and finds that Commerce reasonably concluded, based on the record evidence, that the differences in LOTs -- and therefore, in marketing activities -- was not substantial enough to warrant a CEP offset.

> ### A. DOSCO's Arguments Are Not New, and the Same Reasoning that Supported the Court's Decision in <u>Dong-A Steel</u> Also Applies Here.

DOSCO argues that it engaged in three times as many selling activities at home than abroad (in other words, that its HM LOT was significantly greater than its CEP LOT). Pl.'s Br. at 35.  To demonstrate this, DOSCO provided Commerce with data on its marketing activities, which Commerce grouped into four categories spanning sales and marketing, freight and delivery, inventory maintenance and warehousing, and warranty and technical support.  IDM at 38; see also Pl.'s Br. at 35.  Each category in turn consisted of specific activities: order input and processing, for example, constituted one activity within sales and marketing.  IDM at 38.  Within each

---

[21] Further, 19 C.F.R. § 351.412(c)(1) provides that LOTS will be based on:

   (i)     In the case of export price, the starting price;
   (ii)    In the case of constructed export price, the starting price, as adjusted under section 772(d) of the [Tariff] Act; and
   (iii)   In the case of normal value, the starting price or constructed value.

category, DOSCO summed up the number of activities corresponding to that category and organized the activities by intensity (high, medium, or low).  Pl.'s Br. at 35.  Among these activities, DOSCO documented that at the home market, it engaged in [[       ]] "high" intensity, [[       ]] "medium" intensity, and [[       ]] "low" intensity sales and marketing activities, whereas it performed [[          ]] "high" and [[            ]] "low" intensity activity at the CEP LOT within the same category.  Id.  In total, under DOSCO's reported figures, the company performed [[

    ]] activities at the HM LOT of varying intensities, but [[             ]] at the CEP LOT, giving rise to the three-times difference in LOT activity.  Id.  Furthermore, of the four categories of sales activities, DOSCO asserts that it engaged in three at the HM LOT.  Id.  In contrast, DOSCO reports that it engaged in only two categories of sales activities at the CEP LOT.  Id.

    These arguments mirror claims raised by DOSCO in the earlier case, <u>Dong-A Steel</u>, in which, based on virtually the same facts, the court held that "Commerce acted reasonably when it determined that the record did not support" granting a CEP offset adjustment.  337 F. Supp. 3d at 1373–76.  Specifically, the court held that, even though "DOSCO reported additional selling activities:  sales forecasting, strategic/economic planning, personnel training/exchange, advertising, inventory maintenance, sales/marketing support, and market research in the home market . . . [Commerce reasonably found that] these activities were not substantially different from those performed with respect to DOSCO's U.S. sales."  <u>Dong-A Steel</u>, 337 F. Supp. 3d at 1375.  As in the prior <u>Dong-A Steel</u> case, DOSCO once more reported additional sales activity at the HM LOT, including "annual sales forecasting, annual strategic/economic planning, training of new employees, using stock ledgers and brochures to advertise and promote sales, monitoring raw material prices and exchange rate trends, and making order sheets."  IDM at 39.  And once again, Commerce "acknowledge[d] that the selling functions performed for home market customers may

**PUBLIC VERSION**

have entailed additional activities, [but] disagree[d] that these activities were substantial or so significant that they constitute a different marketing stage." Id.

DOSCO argues specifically that, among other flaws in its reasoning, Commerce "attempted to dismiss" significant pieces of the evidentiary record when reaching its conclusion that a CEP offset was not warranted, especially as it pertained to inventory management. Pl.'s Br. at 37. Under DOSCO's view, the record evidence demonstrates that DOSCO expended significant resources on inventory maintenance activities only at the home market LOT. Id. By contrast, Commerce found that, based on the record evidence, "DOSCO failed to demonstrate that maintaining home market inventory required significant resources . . . ." IDM at 41. As noted, Commerce is entitled to a presumption that it has considered all of the record evidence, absent a showing to the contrary." Jacobi Carbons AB, 422 F. Supp. 3d at 1325 n.10 (citations omitted). Here, in fact, DOSCO readily admits that Commerce had considered the evidence by virtue of "attempting to dismiss" it. Pl.'s Br. at 37. At this point, then, the interpretation of the record evidence becomes a matter of disagreement between DOSCO and Commerce. This disagreement persisted in this litigation. For instance, in responding to the court's questions the Government reaffirmed its position that:

> Commerce found that the company's [DOSCO's] review of its inventory (including the use of stock ledgers) and creation of home market order sheets appear to be basic administrative functions that involved little actual selling activity, and this evidence does not support DOSCO's claim that the home market inventory maintenance activities were extensive.

Def.'s Resp. to the Court's Questions at 11 (citations omitted).

The court may find that substantial evidence supports Commerce's findings despite the possibility that two inconsistent conclusions may be drawn from the record. Aluminum Extrusions Fair Trade Comm, 36 CIT at 1373. Commerce acted reasonably in finding DOSCO's evidence to

be uncompelling.  As evidence of the cost of maintaining a warehouse to store inventory, DOSCO

referred to DOSCO's Section B Response and accompanying exhibits.  Pl.'s Br. at 37.  Exhibit B-

15, showing "inventory carrying costs," simply provides for the "calculation of the inventory

carrying period," which represents the average duration for which a business holds onto its

inventory.  Letter from DOSCO to Sec'y of Commerce, re: DOSCO's Sec. B–D Questionnaire

Resps. at B-36–B-37; Exh. B-15 (March 12, 2018), C.R. 25–35, P.R. 56–61.  The inventory

carrying period is estimated from averaged sales and inventory amounts.  Id.  While Exhibit B-15

indeed contains the data on DOSCO's sales and inventory values measured monthly and quarterly,

it does not provision explicit data on the actual costs associated with maintaining the inventory

storage.  Id. at Exh. B-15.  Rather, DOSCO's [[          ]] inventory carrying period for HWR must

be scaled by an "applicable short term interest rate" to estimate the inventory carrying costs, or the

costs associated with maintaining the inventory balance.  Id. at B-36–B-37; Exh. B-15.  Faced with

this approach to inventory carrying cost estimates, the court affords "tremendous deference" to

determinations drawn from Commerce's technical expertise, including determinations of

definitions and appropriate methodologies.  See Fujitsu Gen., 88 F.3d at 1039.  Under such a view,

it was reasonable for Commerce to conclude based on substantial evidence that "DOSCO failed to

demonstrate that maintaining home market inventory required significant resources or indeed, any

resources beyond placing products in its own storage area at the factory and then removing them

once it sold the products."  See Def.'s Br. at 32; Ta Chen Stainless Steel Pipe, Inc. v. United States,

298 F.3d at 1335 (quotation omitted).  Further, even assuming the validity of DOSCO's proffered

methodology and evidence for the calculation of the inventory carrying costs, Commerce is still

entitled to draw its own conclusions over what constitutes a sufficiently "significant" difference in

LOTs so as to merit a CEP offset.  See 19 C.F.R. § 351.412(c)(2) ("Substantial difference . . . are

a necessary, but not sufficient, condition"). This being the case, it was reasonable for Commerce to determine, as it did, that DOSCO failed to meet its evidentiary burden on the inventory aspect.

Beyond inventory management, similar disputes arise between DOSCO's and Commerce's interpretation of the record. For instance, Plaintiffs note that DOSCO had only [[      ]] sales personnel dedicated to the U.S. market but had [[                    ]] salespersons and staff servicing the home market. Pl.'s Br. at 36. The Government argues that Commerce acknowledged the difference in the sizes of the respective sales forces, but based on the record evidence determined that the HM staff's activities -- consisting primarily of producing an annual business plan and a sales forecasting report -- did not "pertain[] exclusively to the home market." Def.'s Br. at 32 (quoting IDM at 40). Rather, under Commerce's view, the work produced by what DOSCO pointed to as regional-specific staff in fact related to "high level annual sales strategies" that guided and impacted both the home and CEP markets. Id. As for the other evidence raised by DOSCO to demonstrate the difference between its HM and CEP LOTS -- for example the "education system" DOSCO set up to train salespeople, the cultivation of regional clientele and the development of regional research -- Commerce reasonably determined either that the evidence was insufficient to reach DOSCO's desired conclusion, IDM at 40, or else was overrepresented by DOSCO, IDM at 41.[22] In short, Commerce did not find the record to be deficient, merely that DOSCO's reasoning -- based on the same evidence -- was uncompelling.

---

[22] Similarly, DOSCO's contention that "Commerce never requested any additional information or clarifications regarding DOSCO's CEP offset claim in any supplemental questionnaire or otherwise indicated that any deficiency existed in the record regarding this issue" is misplaced and lacks muster. Pl.'s Reply Br. at 18. The burden falls to the party seeking the CEP offset to provide the requisite evidence that would allow Commerce to determine that a CEP offset adjustment is warranted. See, e.g., Hyundai II, 365 F. Supp. 3d at 1297; 19 C.F.R. § 351.401(b). That Commerce did not request any additional information beyond what was provided by DOSCO does not discredit the validity of the conclusion drawn from that evidence. Furthermore, Commerce had no obligation under 19 U.S.C. § 1677m(d) to work with DOSCO to correct for "deficiencies"

For these reasons, the court affirms Commerce's determination with respect to the denial of the CEP offset claim.

### V. *Commerce's Adjustment of Reported Costs Is Supported by Substantial Record Evidence.*

Following a comment submitted by petitioners in response to the <u>Preliminary Results</u>, Commerce updated the <u>Final Results</u> to reflect an additional adjustment to the calculation of DOSCO's AD margin, by compensating for the fact that "DOSCO has reported significantly different [HRC input] costs for similar CONNUMs." IDM at 42 (discussing "cost differences unrelated to defined physical characteristics"). Specifically, Commerce "adjusted the reported CONNUMs that are identical in all of Commerce's physical characteristics except for painting . . . to reflect the same HRC cost." IDM at 42. DOSCO contests that the adjustment was unreasonable and unsupported by substantial evidence, since, as DOSCO asserts, the decision lacked quantitative support and ran afoul of Commerce's statutory obligations to eliminate distortions in its calculations wherever possible. Pl.'s Br. at 39.

### A. *Basis for the Adjustment*

At the start of every investigation, Commerce defines the key physical characteristics for the product under investigation. The characteristics represent the elements that "define unique products, i.e., the CONNUMs, for sales comparison purposes." IDM at 43. In the case at hand, Commerce identified the key characteristics of HWR to be the "steel input type, quality, metal coating, painting, perimeter, wall thickness, scarfing, and shape." <u>Id</u>. Differences among each product's reported costs "should reflect meaningful differences attributable to these different

---

in the record, since as discussed above, it does not appear that deficiencies existed in the first place. <u>See</u> Pl.'s Reply Br. at 18. Rather, the fundamental difference in conclusions reached by DOSCO and Commerce derived not from any shortcomings in the data, but rather from differing yet equally reasonable interpretations of the evidence.

physical characteristics." Id. (citations omitted).  Here, however, Commerce found that "the large fluctuation in costs between [DOSCO's] CONNUMs cannot be explained by the physical characteristics of those CONNUMs.  Rather, the differences are linked to production time and quantities, and trial runs in some instances." Id.  To correct for the "arbitrary cost differences between nearly identical CONNUMs which are independent of the physical characteristics," Commerce saw fit to apply an additional adjustment to DOSCO's reported cost figures. Id. at 44.

DOSCO argues two points.  DOSCO contends first, that Commerce's "determination was devoid of any quantitative analysis," and second, that "Commerce's determination undermined the statutorily required difference-in-merchandise ("DIFMER") adjustment." Pl.'s Br. at 39–40.  The Government contends that DOSCO's two claims lack merit while Commerce's decision is supported by substantial evidence. Id.[23]

### B. *Commerce's Determination Is Supported by Substantial Evidence.*

Firstly, DOSCO claims that Commerce erred by not providing quantitative analysis to support its determination to adjust the reported raw material costs. Pl.'s Br. at 39.  DOSCO itself asserts that there existed a cost variation of [[      ]] percent between two given CONNUM pairs, which DOSCO holds out to be so small as to be negligible. Id. at 40.  However, as DOSCO correctly argued, Commerce has an obligation to be as accurate as possible in the computation of

---

[23] The Government, in a one-sentence assertion, argues that DOSCO has waived its right to raise either argument.  Def.'s Br. at 35 (citing Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998)).  Though the Government does not directly say so, it effectively argues that DOSCO failed to exhaust administrative remedies.  Failure of exhaustion is simply not the case here. See Timken Co. v. United States, 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340–41 (2002). DOSCO successfully points to several occasions where it advanced its challenges, and where Commerce incorporated those concerns through its responses. See DOSCO's Resp. to Questions for Oral Arg. at 18 (citing DOSCO's Rebuttal Br. at 17–19); IDM at 42 (discussing the points raised in DOSCO's Rebuttal Brief, including the size of some of the cost differences being so small as to "require no explanation" and "differences in production time and quantity," among others).

Consol. Court No. 19-00104                                                  Page 48
*PUBLIC VERSION*

AD margins.  <u>See</u> Pl.'s Br. at 25 (citing <u>Rhone Poulenc</u>, 899 F.2d at 1191).  In the interest of

maximizing accuracy, even a [[      ]] percent variation should not be overlooked.[24]  Moreover,

the Government accurately and compellingly points out that DOSCO provides no authority or

statutory basis explicitly requiring Commerce to justify a finding of cost differences with a robust

quantitative analysis, or indeed any quantitative analysis at all.  Def.'s Br. at 35.  The Government

also notes that Commerce's determinations of applicable adjustments (as evidenced here with

regard to cost adjustments) are consistent with practices previously sustained by the courts,

including a holding that "Commerce's methodology is 'presumptively correct'. . . [insofar as

plaintiff] has not shown that Commerce lacked authority to adjust costs based on differences in

physical characteristics."  <u>Id.</u> at 36 (quoting <u>Thai Plastic Bags Industries Co. v. United States</u>, 746

F.3d 1358, 1368 (Fed. Cir. 2014)).

     Secondly, DOSCO argues that, under the provisions of 19 U.S.C. § 1677b(a)(6)(C)(ii):

> Commerce is required to increase or decrease normal value -- as the case may be -
> - to account for . . . the DIFMER adjustment to the net selling prices in the
> comparison market, . . . to account for the differences in the physical characteristics
> of the merchandise sold in the United States and the comparison market, and is
> calculated as the difference between the variable costs of manufacturing
> ("VCOM") of the two similar CONNUMs.

Pl.'s Br. at 40 (citing IDM at 43).  "If the VCOM of the U.S. model is lower than the VCOM of

the similar comparison market model, normal value is reduced by the difference in those VCOMs."

<u>Id.</u>  Under DOSCO's view, "by smoothing the costs such that the HRC costs were the same for

CONNUMs that are identical but for whether the finished product is painted . . . Commerce

---

[24] Plaintiffs posit that "Commerce failed to articulate the circumstances under which a cost
variation is 'significant,' failed to explain what is the significance threshold above which cost
variations rise to the level of a distortion that must be corrected, and, most importantly, failed to
explain why the cost variations between DOSCO's painted and non-painted products were so
'significant' that an adjustment was warranted."  Pl.'s Reply at 20.  However, Plaintiffs present no
alternatives for defining significance, beyond asserting that Commerce failed to do so.

introduced rather than eliminated distortions into the calculations."[25]  Id.  In this manner, DOSCO

argues that the adjustment imposed by Commerce actually violated the underlying purpose of the

DIFMER adjustment -- "to capture physical differences in merchandise."  Pl.'s Reply at 20

(quoting IDM at 36); see also 19 C.F.R. § 351.411(b).  However, DOSCO does not provide any

evidence of the purported distortions resulting from Commerce's determination.  The Government,

in response, asserts that Commerce's adjustments "ensure that differences in cost were related only

to differences in physical characteristics (here, painting)," and therefore fall squarely within the

defined purpose of the DIFMER adjustment.  Def.'s Br. at 36.  Because DOSCO has not

demonstrated the scope or extent of the alleged distortion and 19 C.F.R. § 351.411(b) gives

Commerce the discretion to adjust for variations in "costs associated with the physical

differences," the court sustains Commerce's adjustments.

## CONCLUSION

For the reasons discussed above, the court sustains (1) Commerce's use of DOSCO's

theoretical weights for the calculation of DOSCO's dumping margin; (2) Commerce's denial of

DOSCO's CEP offset claim; and (3) Commerce's decision to adjust DOSCO's reported raw

material costs as supported by substantial evidence and in accordance with law.  However, because

the court finds: (1) Commerce's PMS determination to be unsupported by substantial evidence and

not in accordance with law; and (2) Commerce's PMS adjustment to be improper under the

provisions of the TPEA, the court remands to Commerce its PMS determination and adjustment

---

[25] As DOSCO describes it, smoothing the costs eliminated the "true variations in the VCOMs" that
would have otherwise been captured in the selling prices.  Pl.'s Br. at 40.  Without adjusting the
sales prices commensurately, DOSCO purports that Commerce effectively introduced a distortion
into their margin calculations.  Id.

*PUBLIC VERSION*

and calculation of dumping margins consistent with this opinion.[26]  Commerce shall file with the court and provide to the parties its remand results within 90 days of the date of this order; thereafter the parties shall have 30 days to submit briefs addressing the revised final determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

   **SO ORDERED.**

                 /s/  *Gary S. Katzmann*
                     Judge

Dated: September 29, 2020
     New York, New York

---

[26] As appropriate, Commerce should also recalculate the AD margin applied to Kukje in line with this opinion.